1

1    IN THE UNITED STATES DISTRICT
2    FOR THE WESTERN DISTRICT OF TENNESSEE
     WESTERN DIVISION

3    ────────────────────────────────────────────

     UNITED STATES OF AMERICA,

4
                    Plaintiff,

5
     vs.                              NO. 21-cr-20192

6
     TEVIN RICHARDSON,

7
                    Defendant.

8    ────────────────────────────────────────────

9            MOTION TO SUPPRESS

10             BEFORE THE

11       HONORABLE THOMAS L. PARKER

12

13           October 17, 2022

14

15

16

17

18

19     CATHERINE J. PHILLIPS, FAPR, RMR, CMRS
            OFFICIAL REPORTER
20      FOURTH FLOOR FEDERAL BUILDING
         MEMPHIS, TENNESSEE 38103
21

22

23

24

25

                UNREDACTED TRANSCRIPT

```
 1              A  P  P  E  A  R  A  N  C  E  S

 2

 3

 4

 5        Appearing on behalf of the Plaintiff:

 6             WENDY K. CORNEJO, ESQUIRE
               U.S. Attorney's Office
 7             167 N. Main Street, Suite 800
               Memphis, TN 38103
 8             901.554.4231
               wendy.cornejo@usdoj.gov
 9

10

11        Appearing on behalf of the Defendant:

12             JOHN A. IRVINE, JR., ESQUIRE
               Shea, Moskovitz & McGhee
               530 Oak Court Dr., Suite 355
13             Memphis, TN 38117
               901.821.0044
14             jirvine@mmbcm.com

15

16

17

18

19

20

21

22

23

24

25
```

1                          **I N D E X**

2

3                                                    <u>**PAGE**</u>

4     PROCEEDINGS                                      **4**

5     WITNESS: AGENT CHASE COGSWELL

6         DIRECT EXAMINATION BY MS. CORNEJO           **12**

7         CROSS-EXAMINATION BY MR. IRVINE             **24**

8         REDIRECT EXAMINATION BY MS. CORNEJO         **39**

9     CERTIFICATE                                     **62**

10

11

12    <u>**EXHIBITS**</u>                                   <u>**PAGE**</u>

13    Exhibit Nos. 1, 2 & 3                            **8**

14    Exhibit No. 4                                    **23**

15    Exhibit No. 5                                    **30**

16    Exhibit No. 6                                    **41**

17

18

19

20

21

22

23

24

25

4

```
 1                           Monday

 2                      October 17, 2022

 3

 4        The Motion to Suppress in this case began on this

 5   date, Monday, October 17, 2022, at 10:30 a.m., when and where

 6   evidence was introduced and proceedings were had as follows:

 7

 8                   ----------------------

 9             CASE MANAGER:  All rise.  The United States

10   District Court for the Western District of Tennessee is now

11   in session pursuant to adjournment.  The Honorable Thomas L.

12   Parker presiding.  God save the United States and this

13   Honorable Court.  You may be seated.

14             THE COURT:  Good morning.

15             MS. CORNEJO:  Good morning, Judge.

16             MR. IRVINE:  Good morning.

17             THE COURT:  We have water again, so help

18   yourself.

19             This is in the matter of the United States versus

20   Tevin Richardson.  Mr. Richardson is present in the courtroom

21   with counsel, Mr. Irvine.  Good morning.

22             We have Ms. Cornejo present on behalf of the

23   Government.

24             MS. CORNEJO:  Good morning, Your Honor.

25             THE COURT:  Good morning.
```

1      So what I show is -- or what I'm expecting is a

2  motion to suppress this morning.  I have reviewed some

3  material that the Government provided.  It was -- at least

4  what I reviewed, and there may have been more to it, but I

5  reviewed an audio recording of a conversation between Special

6  Agent Cogswell and the defendant.  But that's all I've

7  reviewed, other than the material that the parties have

8  submitted, the written documents.

9      Mr. Irvine, what don't we start with you telling

10  me -- as I understand it, there are kind of two steps to

11  this:  One, you're claiming that the statement lacked Miranda

12  warnings, and therefore it should be suppressed.  And once

13  you suppress the statement, the search of the residence

14  should also be suppressed, because it was based on consent

15  that was obtained after the statement.

16      Is that fair?  Or please help me where I'm --

17      MR. IRVINE:  Clear on the first part --

18      THE COURT:  Okay.

19      MR. IRVINE:  -- not so clear cut on the second

20  part.

21      THE COURT:  Well, good.  Well, then help me.

22      MR. IRVINE:  Regarding issue one, he wasn't

23  Mirandized.  Agent Cogswell clearly intended to talk to him,

24  he turned on his voice recorder, recorded him for some

25  43 minutes, he wasn't Mirandized and so his statement should

1    be suppressed.

2            The law on issue two isn't as clear, because a

3    consent to search can cure the lack of Miranda, but that

4    consent has to be voluntary.  And case law says that it's up

5    to the Government to establish by a preponderance of the

6    evidence that it was voluntary, given all the circumstances

7    and things like custody is one issue, things like telling a

8    defendant that the search is inevitable, it's going to go

9    ahead and happen.  All of those are factors that weigh into

10   the Court's decision on whether or not it's voluntary.

11           THE COURT:  But there are few bright lines, as I

12   understand it, when it comes to that.  I mean, obviously

13   voluntary is the key.  But some of those things, it's more of

14   a sliding scale.  Do you agree with that?

15           MR. IRVINE:  I do agree with that.

16           THE COURT:  Okay.  Anything else you want to --

17           MR. IRVINE:  I did not see any case law in which

18   bright-line factors were applied, more just totality of the

19   circumstances, and the Court has to make that decision.

20           THE COURT:  Right.  Okay.  Anything else you want

21   to tell me about the motion before we get started?

22           MR. IRVINE:  Not before we start, Your Honor.

23           THE COURT:  All right.  Ms. Cornejo, anything you

24   want me to know before we get started?

25           MS. CORNEJO:  Your Honor, before we get started,

1    I would like -- Mr. Irvine and I have discussed the fact that

2    he will not be making any objection as to making the audio

3    and -- what else? -- as part of the exhibit.

4              MR. IRVINE:  We had discussed marking three

5    things, the audio, the transcript, and the consent to search.

6              MS. CORNEJO:  Correct.

7              MR. IRVINE:  And we can do that ahead of time or

8    the consent to search will probably come up in testimony.

9              MS. CORNEJO:  But either way, we do also have --

10   I believe the transcript was also provided in our response.

11             THE COURT:  It was.

12             MS. CORNEJO:  I don't know if Your Honor had a

13   chance to review that.

14             THE COURT:  I just listened.

15             MS. CORNEJO:  Okay.

16             THE COURT:  But it's there if I need it.  Right.

17             MS. CORNEJO:  Okay.  So I would like to admit

18   those prior to beginning just so we have that all out.

19             THE COURT:  Sure.  Okay.  If you want to bring

20   those forward.

21             MS. CORNEJO:  Yes, Your Honor.

22             THE COURT:  Now, the audio, as I recall, was

23   submitted with an email maybe.  Or was that --

24             MS. CORNEJO:  I emailed it, but then it didn't

25   work because the file was too big.  So I believe my legal

1   assistant brought an actual DVD, which I will also -- I have

2   an extra copy, so we can make that an exhibit as well,

3   Your Honor.

4              THE COURT:  If you've got that, that would be

5   helpful.

6              MS. CORNEJO:  Thank you.

7              THE COURT:  Now, you know what, I've got it.  I'm

8   sorry.

9              MS. CORNEJO:  That's okay.  We can have that --

10  this one can be the one that's entered into evidence.

11             THE COURT:  Perfect.  Thank you.

12             MS. CORNEJO:  And the only thing I want

13  Your Honor to focus on -- are we doing opening statements or

14  not?

15             THE COURT:  It's up to you.  That's why I said,

16  anything you want me to know.

17             MS. CORNEJO:  Yes.  I will never take the

18  opportunity to talk in court, Your Honor, as Your Honor well

19  knows.

20             (Exhibit Nos. 1, 2 & 3 admitted.)

21             THE COURT:  Did you mean what you just said or --

22  you said I would never take the opportunity.  You mean pass

23  it by.

24             MS. CORNEJO:  Pass, there you go.

25             Your Honor, on today's court date, the Government

1   is seeking that you deny counsel's motion to suppress

2   evidence.

3            As Your Honor is very well aware, you have heard

4   our -- you have read both counsel's motion and my response.

5   And we will, obviously, be resting on all of those arguments

6   that we made.

7            On today's court date, we will ask Your Honor to

8   focus on the fact that the Government is not disputing the

9   fact that the defendant was in custody on the date in

10  question, which was November 12th of 2021.  We're not

11  disputing that, we're admitting to it.  But when

12  Agent Cogswell takes the stand, he will tell you that he in

13  essence did not interrogate Mr. Richardson.  If anything,

14  what he was doing was having a conversation with

15  Mr. Richardson.  Mr. Richardson was asking Agent Cogswell

16  questions about cooperation and things of that nature.

17           Nonetheless, Your Honor, it is our position that

18  even if Your Honor believes that any of those statements that

19  came during that conversation were unconstitutional, we still

20  believe that the consent in this case is voluntary.

21           Your Honor stated that he did hear the audio of

22  Agent Cogswell's conversation with the defendant.

23  Agent Cogswell was polite, he was courteous, he answered all

24  of his questions.  I'm sure in your experience you've heard

25  very different sorts of interviews where there's yelling and

1    screaming and threats.  No threats were made.  Agent Cogswell

2    didn't have a gun pointing at him.  So there's a lot of those

3    things that Your Honor needs to take into account.

4              However, something that the defense fails to

5    acknowledge, which it is the Government's position is very

6    important, in this case even if Your Honor says, okay,

7    Richardson's consent was not voluntary, we still have Malia

8    Niles.  She gave consent.  She signed the consent form.

9    She's not a party in this case.  And there is nothing to

10   dispute the fact that she had actual and apparent authority

11   to grant consent.

12             So despite all the factors, and, of course, the

13   Government will submit Agent Cogswell to testify,

14   specifically as to the consent issues, it is our position

15   that even if Your Honor agrees with counsel, there is no

16   getting over the fact that Malia Niles, girlfriend -- I don't

17   know if now they're married, but they're clearly together.

18   There's pictures all over the apartment that you'll see, they

19   call themselves The Richardsons, and she signed the Consent

20   to Search form herself as well.

21             So at the end of the day, Your Honor, we will be

22   asking that you deny counsel's motion to suppress.

23             THE COURT:  Okay.  I'm ready if you are.

24             MS. CORNEJO:  All right.  We would like to call

25   Agent Cogswell to testify please.

1               (AGENT CHASE COGSWELL duly sworn.)

2               THE WITNESS:  I do.

3               CASE MANAGER:  Thank you.  You may have a seat at

4    the witness stand.

5               THE WITNESS:  Yes, sir.

6               Good morning, Your Honor.

7               THE COURT:  Good morning.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         *   *   *

2                    AGENT CHASE COGSWELL,

3            was duly sworn testified as follows:

4                     DIRECT EXAMINATION

5    BY MS. CORNEJO:

6    Q.      Good morning, Agent Cogswell.  Can you please spell

7    and state your name for the court reporter.

8    A.      Yes.  Chase Cogswell.  C-H-A-S-E C-O-G-S-W-E-L-L.

9    Q.      Agent Cogswell, were are you employed and in what

10   capacity?

11   A.      At this time I was employed as a special agent with

12   the Bureau of Alcohol, Tobacco, Firearms and Explosives, or

13   ATF.

14   Q.      And how long have you been employed by ATF?

15   A.      Since 2018.

16   Q.      Prior to your employment with ATF, did you work in any

17   other law enforcement capacity?

18   A.      Yes, I worked for less than a year for Homeland

19   Security Investigations.  Prior to that I was a Savannah,

20   Georgia, police officer, including being a U.S. Marshals Task

21   Force officer for several years.  Prior to that, I was a

22   correctional officer in Virginia.

23   Q.      Agent Cogswell, can you briefly tell us did you begin

24   an investigation in January of 2020 involving a gang, the

25   Unknown Vice Lords?

1   A.      Yes.

2   Q.      And once you began this investigation, did you become

3   aware of a subject or a man named Tevin Richardson?

4   A.      Yes.

5   Q.      And do you see Tevin Richardson in court today?

6   A.      Yes.  He's the gentleman in the red jumpsuit with a

7   mask on.

8               MS. CORNEJO:  Your Honor, if the record could

9   reflect an in-court identification of the witness -- or of

10  the defendant by the witness.

11              THE COURT:  Any objection?

12              MR. IRVINE:  No, Your Honor.

13              THE COURT:  Without objection, the record will

14  reflect that he's identified Mr. Richardson.  Yes, ma'am.

15              MS. CORNEJO:  Thank you.

16  BY MS. CORNEJO:

17  Q.      Now, approximately, August of 2021, was Mr. Richardson

18  indicted?

19  A.      Yes.

20  Q.      And what was it for?

21  A.      922(g)(1), which is possession of a firearm by a

22  convicted felon.

23  Q.      After he was indicted, did you obtain an arrest

24  warrant, Agent Cogswell?

25  A.      Yes.

*TESTIMONY OF AGENT CHASE COGSWELL*                          14

1  Q.      And after you obtained the arrest warrant, when did

2  you effectuate that arrest warrant?

3  A.      November of 2021, November 12th.

4  Q.      Specific -- yes, November 12th.  Thank you.

5          And once you -- can you just tell us how you and your

6  team effectuate arrest warrants specifically.

7  A.      Yes.  This day I was working with the U.S. Marshal

8  Service, so a team of U.S. Marshals.  I was there in support

9  of their arrest of Mr. Richardson.

10         When they're doing it, they basically -- they take the

11  reins on it, so to speak, so I was out on perimeter on the

12  outside.  They made contact with Ms. Niles at the door.  And

13  I went up to assist them with the search for Mr. Richardson

14  once they had made contact with her.

15  Q.     You just referenced Ms. Miles [sic].  Do you know who

16  Malia Miles is?

17  A.      Yes.  Niles with an N.  And that's Mr. Richardson's

18  girlfriend.

19  Q.     Okay.  And can you tell us what happened once you went

20  inside the residence.

21  A.      Yes.  So I already pretty much knew that he lived

22  there.  I had spoken with Ms. Niles on the phone previously.

23  There was every indication they were living together.  The

24  car that he had been seen in previously was parked outside.

25  So when we went in, saw more indicia that they were living

*TESTIMONY OF AGENT CHASE COGSWELL*                    15

1   together, including his picture on the wall.  A big placard

2   that said The Richardsons on the wall.

3        While searching for Mr. Richardson, there was a loose

4   round of ammunition on the floor between the bed and the

5   nightstand.  And when looking underneath the bed to see if he

6   was hiding underneath the bed, there was a magazine

7   containing ammunition up in the bottom of the box spring.

8   Q.    Let me just take you back a little bit.  You said that

9   your observed loose ammunition on the floor?

10  A.    Yes.  There was one loose round on the floor, just to

11  the right of the bed, between the bed and the nightstand.

12  Q.    And based on your observations, could you tell whose

13  bedroom that was?

14  A.    Yes, that was Malia and Tevin Richardson's.

15  Q.    Based on your investigation, did you know whether

16  Mr. Richardson was legally able to be in possession of

17  firearm ammunition?

18  A.    He's not.  I'm aware he's a convicted felon.

19  Q.    Now, can you tell us a little bit about -- you said

20  you looked under the mattress.  Why did you do that?

21  A.    Because people hide under mattresses.  We had actually

22  had his -- it was his sex offender manager reach out to him

23  that morning and had spoken to him on the phone.  And when I

24  called the same phone number that they had spoken to him on,

25  a phone on the table rang.  It was saved as -- my number was

*TESTIMONY OF AGENT CHASE COGSWELL*                          16

1   saved as ATF dude, because I had spoken to him previously.

2   So that was just further leading that he was there hiding

3   somewhere.  It was just a matter of where, so we were looking

4   for him.

5   Q.     So at this point when you saw the loose ammunition on

6   the floor and lifted up the mattress, had you found

7   Mr. Richardson at this point?

8   A.     No.

9   Q.     And can you tell us what happened if and when he was

10  found.

11  A.     Yes, he was -- he eventually came out.  He was in the

12  attic.  He eventually came out from hiding in the attic and

13  was arrested.

14  Q.     And who arrested him?

15  A.     The marshals.

16  Q.     Okay.  Now, after he was arrested, what happened next,

17  Agent Cogswell?

18  A.     I informed his girlfriend -- his girlfriend and I

19  think it was two kids, it was either one or two had gone --

20  they knew the neighbors in the apartment next door, so they

21  were over there, in there just to be inside to be warm.  So I

22  informed her that he had been arrested, and then I went over

23  to speak to Mr. Richardson.

24  Q.     Okay.  And did you Mirandize the defendant?

25  A.     No.

1  Q.      Why did you not Mirandize him?

2  A.      I was going to if I was going to question him later.

3  But a lot of time -- people don't know the process when

4  they're arrested or when they're dealing, especially with

5  federal law enforcement.  A lot of people never have before,

6  and so there's a lot of questions about what's going on,

7  what's next.  So that's where we were at that point.

8  Q.      Agent Cogswell, you've had a chance to review --

9          MS. CORNEJO:  Your Honor, what is the exhibit

10  numbers for the audio and the transcript?

11          THE COURT:  All right.  Let's look.

12          CASE MANAGER:  Transcript is Number 1.

13          THE COURT:  The transcript is 1.

14          CASE MANAGER:  The audio/DVD is number 3.

15          THE COURT:  The audio is number 3.  And the

16  Consent to Search is Number 2.

17  BY MS. CORNEJO:

18  Q.      So, Agent Cogswell, you have had a chance to review a

19  transcript of your conversation with Mr. Richardson on

20  November 12th of 2021; correct?

21  A.      Yes, I recorded the conversation and I reviewed the

22  transcript.

23  Q.      And, in addition, you also have reviewed Exhibit

24  Number 3, which is the actual audio that you took of the

25  conversation.

1   A.      Yes.

2   Q.      And can you tell us why you recorded that?

3   A.      Variety of reasons.  Protects you from allegations of

4   misconduct.  And sometimes people make statements, such as in

5   this case where even without questioning people say things.

6   Q.      Okay.  Now, specifically, where did this conversation

7   occur?

8   A.      In Mr. Richardson's living room.

9   Q.      And can you, without telling us word for word, can you

10  just tell us what was the nature of this conversation?

11  A.      It was about -- it's a larger gang case, as you've

12  expressed, it started a long time ago.  And it was about his

13  opportunity to cooperate in the larger case, what his options

14  were, and what the future held, how he and his family could

15  remain safe should he consider to cooperate.

16  Q.      When you say it was a larger case, had you been

17  investigating violent acts committed by the Unknown Vice

18  Lords?

19  A.      Yes.

20  Q.      And, based on your investigation, is the defendant a

21  part of this organization?

22  A.      Yes.

23  Q.      And did you answer his questions that he had for you?

24  A.      I did.

25  Q.      After you observed the loose round of ammunition, did

1  you contact the United States Attorney's Office?

2  A.     Yes.

3  Q.     And did you ask whether you would be able to obtain a

4  search warrant based on probable cause?

5  A.     Yes.  I provided the facts and said, what do you think

6  about this set of facts regarding if we should apply for a

7  search warrant for this apartment.

8  Q.     And were you given permission to start drafting a

9  search warrant?

10  A.     Yes.

11  Q.     Okay.  Did you inform the defendant of that?

12  A.     Yes.  I told him that I could apply for a search

13  warrant.  The Judge may or may not sign it.  I believed there

14  was probable cause, but it was up to the Judge.

15  Q.     Okay.  And when you were having this conversation with

16  the defendant, were you alone in the room with him?

17  A.     I can't remember.  I know he asked to speak privately.

18  I can't remember if somebody stayed with me or not.

19  Q.     Were you pointing a gun at Mr. Richardson while he was

20  talking to you?

21  A.     No.

22  Q.     Did you make any threats to him?

23  A.     No, not at all.

24  Q.     And how would you characterize just the overall nature

25  of the conversation between you and the defendant?

1  A.       It was relaxed.  He had some questions and I had some

2  answers.  He had questions about the booking process, so I

3  called one of the marshals to ask him questions about if he

4  would go to 201 or what jail he would be going to.

5         Like I said, a lot of people just don't know the

6  process.  I do, but you can't take for granted that everybody

7  does because they don't.

8  Q.       At some point did Ms. Niles come into the living

9  room --

10  A.       Yes, she did.

11  Q.       -- and had a conversation with both you and the

12  defendant?

13  A.       Yes.

14  Q.       And can you tell us were you able to obtain consent to

15  search the residence from Ms. Niles?

16  A.       Yes.  Both she and Mr. Richardson gave consent, and

17  they signed a Consent to Search form.

18  Q.       And after that Consent to Search form was signed, what

19  did you and your fellow agents do next?

20  A.       Went back, recovered the firearm and the ammunition,

21  and searched the rest of the apartment and recovered some

22  more ammunition and firearm accessories and some marijuana.

23  Q.       Now, specifically, Exhibit 2, which has already been

24  admitted into the record, that is a signed Consent to Search

25  form filled out by yourself -- or signed by yourself, by

1   Mr. Richardson, and Ms. Niles; correct?

2   A.     Yes.  And another agent that was present, Special

3   Agent Bullock.

4   Q.     And that's Milan Bullock, B-U-L-L-O-C-K?

5   A.     Yes.

6             THE COURT:  How do you spell the first name?

7             MS. CORNEJO:  M-I-L-A-N.

8   BY MS. CORNEJO:

9   Q.     In addition to getting the consent to search the

10  residence, did you also obtain consent to search any other

11  part of their property?

12  A.     Several vehicles that were associated with them

13  outside, I believe it was three vehicles.  There was a

14  Hyundai Elantra, a pickup truck, and something else.  Nothing

15  was recovered out of the cars.

16  Q.     Why did you have both Ms. Niles and Mr. Richardson

17  sign the Consent to Search form?

18  A.     They both lived there.

19  Q.     If Ms. Niles or Mr. Richardson would not have signed a

20  Consent to Search form, what would you have done?

21  A.     Applied for a search warrant.

22             MS. CORNEJO:  Your Honor, may I have a moment,

23  please?

24             THE COURT:  Yes, ma'am.

25  BY MS. CORNEJO:

1  Q.      Agent Cogswell, I'm showing you a photograph.  Can you

2  tell me if you recognize that photograph.

3  A.      Yes, that's the round of ammunition that was on the

4  floor.  The loose round I referenced.

5  Q.      Okay.  Is that the first loose round you saw?

6  A.      Yes.

7  Q.      And did you move anything to take this photograph?

8  A.      No.

9  Q.      Actually, did you take this photograph?

10 A.      Yes.

11 Q.      Okay.  And you said you did not move anything;

12 correct?

13 A.      Correct.

14 Q.      Okay.  Does this loose round truly and accurately

15 depict the way it looked to you on November 12th of 2021?

16 A.      Yes.

17              MS. CORNEJO:  Your Honor --

18              THE COURT:  You mean the photograph?

19              MS. CORNEJO:  Yes.

20              THE COURT:  Does the photograph accurately

21 reflect it?

22              MS. CORNEJO:  Yes.  I apologize.

23              THE WITNESS:  Yes, I do.

24              THE COURT:  Just making sure the record's clear.

25              MS. CORNEJO:  Thank you, Your Honor.  I would

1    like to avoid any appeals if possible.

2              Your Honor, I would be seeking leave to enter

3    this into evidence as an exhibit and publish.

4              THE COURT:  Yes, ma'am.  Exhibit Number 4 will be

5    admitted.  It's a photograph.

6                   (Exhibit No. 4 admitted.)

7              THE COURT:  Here, we can lower the lights a

8    little bit, plus your monitor is there.

9    BY MS. CORNEJO:

10   Q.    Can you circle, Agent Cogswell, where the loose round

11   ammunition is.

12   A.    (Indicating.)

13   Q.    Thank you.

14         And then what is next to the ammunition?

15   A.    This is a nightstand, and the bed was over this way

16   slightly out of sight.  That may be the sheet from it, I'm

17   not sure.

18   Q.    All right.  And you observed this prior to obtaining

19   consent to search; correct?

20   A.    Yes.

21              MS. CORNEJO:  One moment, Your Honor, I just want

22   to make sure...

23              Your Honor, at this point I tender the witness.

24   Thank you.

25              THE COURT:  Cross-examination?

*TESTIMONY OF AGENT CHASE COGSWELL*                    24

1            MR. IRVINE:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3   BY MR. IRVINE:

4   Q.      Good morning, Agent Cogswell.

5   A.      Good morning.

6   Q.      I want to talk to you first about you talking to

7   Mr. Richardson.  Okay?

8   A.      Yes, sir.

9   Q.      So the marshals went in and apprehended him, I

10  believe, in the attic; correct?

11  A.      Yes.

12  Q.      And then they brought him down, put him on a couch,

13  and handcuffed him; correct?

14  A.      Yes.

15  Q.      And had you already been in the house?

16  A.      Yes.

17  Q.      Okay.  So the first thing we see on the transcript,

18  Exhibit 1, reads Male Voice 1.  That's you; correct?

19  A.      I'd have to hear the context, but I believe it is.

20  Q.      Okay.  November 12, 2021, 10:57 a.m., Special

21  Agent Cogswell going in to speak with Tevin Richardson, 6619

22  Rolling Brook, Apartment 4.

23  A.      Yes, that's my voice.

24  Q.      And then you say, what's going on, man.

25  A.      Yes.

1   Q.      Okay.   So that we're clear, you intended to talk to

2   Mr. Richardson.

3   A.      Yes.

4   Q.      You wanted to get his consent to search the apartment.

5   A.      Yes.

6   Q.      And you wanted to talk to him about the facts of your

7   investigation.

8   A.      I wanted to later.  But I didn't at that point intend

9   to ask him questions or try to get information regarding the

10  case we were investigating.  I wanted to give him the

11  opportunity to ask questions and help him understand what was

12  going on.

13  Q.      Well, but you do discuss the fact that Ricky Rogers

14  and Hell Rell were already in custody; correct?

15  A.      Yes.

16  Q.      And you've been talking to other co-conspirators?

17  A.      Yes.

18  Q.      And you're asking him to tell you the truth about what

19  went on out there?

20  A.      I don't recall asking him to go ahead and start

21  telling me the truth about what went on.  I think I told him

22  if we're going to talk, it needs to be the truth.  But I

23  didn't actually ask him to start talking about the facts of

24  the case.

25  Q.      Well, fair enough.  Let's --

1          MR. IRVINE:  May I approach, Your Honor?

2          THE COURT:  Yes, sir.

3   BY MR. IRVINE:

4   Q.     If you would, turn to page 9 of the transcript.

5          THE COURT:  And, by the way, I'm looking at it as

6   well.

7          MR. IRVINE:  Thank you, Your Honor.

8          THE WITNESS:  Yes, sir, I'm there.

9   BY MR. IRVINE:

10  Q.     And starting lines 5 through 10.

11  A.     You want me to read it?

12  Q.     If you would.

13  A.     "This one, too, but it will happen again.  You keep

14  running with that group, it's going to happen.  But if you

15  want to talk to me honestly about what's going on, I mean,

16  the way Hump and Lee were killed.  The only way I could be to

17  you, and Rell and Ricky's in custody, and Ray Ray and Yeyo

18  and Chucky D and all those other folks, is by people taking

19  to me."

20  Q.     So you are wanting to elicit information from

21  Mr. Richardson.

22  A.     Well, I was telling him that the way I was there

23  talking to him is because other people were talking to me.

24  So I hadn't actually asked him about the case.  I just wanted

25  him to understand in his gang there's a rule of never talk to

1   police, and that nobody's following that rule.  So I was

2   trying to help him get over that bump of cooperation like

3   other people had.

4   Q.      Okay.  And I think if we go down to, say, lines 16

5   through 22, if you could review that and read it, please.

6   A.      Yes, sir.  Male Voice 1:  People start talking,

7   telling me where to look.  I didn't know where to look.

8   People tell me where to look.  Hey, you should look here.

9   That's what I do, follow the lead.  But if you want to

10  cooperate with me, I want that.  But if you want to try to

11  trick me or say you were in Fayette County and don't know

12  nothing about it, let's not.  All right?

13              THE COURT:  All right, real quick.  So that's

14  you; is that right?

15              THE WITNESS:  Yes, sir.

16              THE COURT:  Okay.  So Male Voice 1 is

17  Mr. Cogswell.

18              MR. IRVINE:  Mr. Cogswell, yes, sir.

19              THE COURT:  Okay.

20  BY MR. IRVINE:

21  Q.      And I don't want to beat a dead horse here, but he was

22  in custody.

23  A.      Yes.

24  Q.      He was handcuffed.

25  A.      Correct.

1  Q.     You turned on your recorder --

2  A.     Yes.

3  Q.     -- to memorialize you talking to him.

4  A.     Yes.

5  Q.     It wasn't -- to be clear, it wasn't spontaneous

6  utterances made by Mr. Richardson.  I mean, that was the

7  point of the recording, it was an interview.

8  A.     I would say that the statements about where the gun

9  were was a spontaneous utterance.  At that point I was -- I

10 believe I said something along the lines of, I can see

11 ammunition in the box spring.  And he said, you need to look

12 a little further.  So I would describe that as spontaneous

13 utterance if that's what we're talking about.

14 Q.     Okay.  And we'll cover that in a few minutes.  I

15 just --

16 A.     Okay.

17 Q.     We'll get to it.

18 A.     Okay.

19 Q.     Let's move on from the recording and let's talk about

20 the first two things you found.  You had an arrest warrant,

21 right, not a search warrant?

22 A.     Correct.

23 Q.     And because Ms. Niles told you that he was gone and

24 you didn't believe him [sic], you were going to search the

25 apartment to try to find him.

1   A.      Yes.

2   Q.      And you went in what you believed to be their bedroom.

3   A.      Yes.

4   Q.      And you saw a bullet in between the bed and

5    nightstand.

6   A.      Yes.

7   Q.      Now, you told us earlier that you looked under the bed

8    to see if Mr. Richardson was hiding under there.

9   A.      Yes.

10          MR. IRVINE:  May I approach, Your Honor?

11          THE COURT:  Yes, sir.

12   BY MR. IRVINE:

13   Q.      I'll pass you this.  Do you recognize that?

14   A.      Yes, that's the nightstand to the right of the bed,

15    between the bed and the closet.

16   Q.      Okay.  And that's a picture you took.

17   A.      Yes.

18   Q.      Okay.  Now, I want to draw your attention to the

19    actual bed, not the nightstand.

20   A.      Yes, sir.

21   Q.      That's a box spring lying on the ground; correct?

22   A.      I can't tell if it's on the ground or on a frame in

23    that picture.

24   Q.      Well, it's important, so let's take a look at it.  Do

25    you see any bed frame there?

*TESTIMONY OF AGENT CHASE COGSWELL*                    30

 1  A.     I can't tell.  I don't, but I also know there's bed

 2  frames where they don't stick out much.  I can't tell if that

 3  black line along the bottom is a frame or not.

 4              THE COURT:  You want to put it on the ELMO?

 5              MR. IRVINE:  Yes, that would be great.  And why

 6  don't we mark that as the next exhibit.

 7              THE COURT:  All right.  Exhibit Number 5 is the

 8  photograph.

 9                 (Exhibit No. 5 admitted.)

10  BY MR. IRVINE:

11  Q.     Since we're all looking at it, that's like an

12  electrical cord there on the ground; right?

13  A.     I can't tell if that's a cord or if that's a ripped up

14  part of the mattress.  I'm not sure.

15  Q.     Right there where I've put a dot, that's the box

16  spring; right?

17  A.     Yes.

18  Q.     Okay.  And it's pretty clear that box spring's laying

19  on the ground; right?

20  A.     There's a black line along.  I can't tell if that's a

21  little shadow or if that's a bed frame.  I'm just not sure.

22  I don't know if there's another angle photo.  But I can't

23  tell for certain either way in that picture.

24  Q.     Let's see if there's a better one.

25              I'm afraid that's the best we have.

*TESTIMONY OF AGENT CHASE COGSWELL*                    31

1            But you don't have any specific recollection of

2    whether or not that was on the floor or on a frame?

3    A.      I don't.  I know even if it was on the floor, we have

4    to lift it.  While working with the marshals, I've found

5    fugitives inside washing machines with the door shut, I mean

6    all kinds of places.  People get very small.  So if it's

7    anywhere that can hide a person, you really have to check.

8    Q.      Well, you would agree with me that a grown man can't

9    hide in a box spring.  I mean, there are springs in there.

10   A.      They can hide under a box spring, or between them very

11   easily.  I've seen it a hundred times.

12   Q.      A box spring that's laying on the floor?

13   A.      Yes.

14   Q.      So once he's in custody and you're talking to him, and

15   one of the first things you said is that Ms. Niles did not

16   want you to search the apartment.

17   A.      Correct.

18   Q.      So you had asked her for consent and she had told you

19   no.

20   A.      I can't remember if we asked to search for him or to

21   search for evidence, I can't recall.

22   Q.      Okay.

23   A.      It sounds that way, but I just can't remember for

24   sure.

25   Q.      That's all right.  But you do remember her saying that

1   you couldn't search the apartment.

2   A.      Yes.

3   Q.      And so you were going in to try to convince

4   Mr. Richardson to convince her to let you search the

5   apartment.

6   A.      It was -- I wanted to tell him the options.  Again,

7   people don't know the process, I do, so I was informing him

8   that we could apply for a search warrant.  It would displace

9   her for a couple of hours.  She would be comfortable and

10  taken care of, but she would be displaced for a little while.

11  No big deal either way.

12  Q.      Well, and I want to talk to you about that.  If you

13  want to look at -- I'm on page 2 of your transcript.  And I

14  won't have you read the whole thing, but at one point you do

15  say, you're welcome to consent, no pressure, you can talk

16  amongst yourselves.  Or if you want, we can apply for a

17  search warrant.  So you do say those things.

18          But then, if you look down to the next paragraph, but

19  we are going to search, given the round of ammo on the ground

20  and the magazine up inside the box springs.  So we're going

21  to go ahead and look for it.  All right.

22          Now, I'm having trouble reconciling those two things.

23          Were you telling him that you were going to search the

24  apartment no matter what?

25  A.      The main goal, the whole conversation, I think I've

1   said it about five times, was, I'm going to apply.  A judge

2   may or may not sign it.

3            So I think that's the message he clearly got, because

4   I said it over and over again.

5   Q.      But, here, you're telling him you're going to search.

6   We've got to search because of that ammo.

7   A.      Yes, sir.

8   Q.      Okay.  And then I want the record to be clear, I'm not

9   suggesting you said this, but one of those marshals that was

10  there basically tells him that Ms. Niles and the children --

11  and I'm reading page 2, line 24 -- they're not going to be

12  able to come back in here and get clothes on or get

13  comfortable until we get all this situated.  So all you're

14  doing is delaying the inevitable.

15           And I appreciate you tried to come behind him and

16  clean that up a little.  Is that fair?

17  A.      Yes, I did.  I wanted to make it clear that I was in

18  charge and that's now how things were going to go.

19  Q.      Right, and I appreciate that.  But you would agree

20  with me that that's -- Mr. Richardson's getting mixed

21  messages at the very least.

22  A.      I would say very briefly.  But he understood and we

23  did take care of her and the kids.  So he knew pretty quickly

24  we weren't there to stick them out in the cold with no

25  diapers.

*TESTIMONY OF AGENT CHASE COGSWELL*                    34

1    Q.    But that was the gist of what that other agent was

2    saying.

3    A.    I'll have to read what he said again.  They're not

4    going to be able to come back in here and get clothes on or

5    get comfortable until we get all that situated, so all you're

6    doing is delaying the inevitable.

7          Yeah, the gist was that they'd be uncomfortable and

8    that it was going to happen anyway.

9    Q.    Okay.

10   A.    That's how I would take it.

11   Q.    And I think Exhibit 1, which is the audio, you

12   actually recorded 43 minutes with Mr. Richardson; correct?

13   A.    Sounds correct.

14   Q.    Okay.  And in that 43 minutes he never gave consent.

15   A.    Correct.

16   Q.    And in 43 minutes we don't hear Ms. Niles give

17   consent.

18   A.    Correct.

19   Q.    At what point did you decide to turn the recorder off?

20   A.    I believe I went outside to take a phone call.  I

21   can't remember, but I shut it off.  And I think I actually

22   sent somebody to go get a Consent to Search form.  And it was

23   clear, when he started telling me you need to look a little

24   further in that box spring, that we were on the way to a

25   consent to search.

1  Q.      I'm glad you went there, because I was going to ask

2   you about that.

3          So when you search, you're doing a symptomatic search;

4   correct?

5  A.      Yes.

6  Q.      You search one place, you look for stuff, you clear

7   it, then you move on to the next place.

8  A.      I do.

9  Q.      And in this case, you had lifted up the box springs

10  and looked kind of under where there was a hole in the bottom

11  of the box springs?

12  A.      Yes.

13  Q.      And you found a 9MM magazine for a Glock.

14  A.      I don't recall if it was a Glock magazine, but there

15  was a pistol magazine with ammunition.

16  Q.      Okay.  And that's all you discovered the first time.

17  A.      That's all I saw, yes.

18  Q.      Okay.  Then you were asking him about his guns,

19  whether or not he has long guns in the apartment.  And he

20  tells you that he's got one gun for protection.  Correct?

21  A.      Yes, he told me that.

22  Q.      And you sent you back to where you had already looked,

23  a spot that you had already cleared; correct?

24  A.      Well, I had cleared it for people but I hadn't

25  searched for evidence.  So I don't -- like you said, I don't

1   think a person could go through a hole, six inches wide,

2   inside a box spring, so I didn't get down and shine my

3   flashlight all the way down in there.  I just lifted the box

4   spring, saw the ammunition and no person and put it back

5   down.  So it hadn't been cleared of evidence, it had been

6   cleared of people.  Because the search was to go back and try

7   to recover evidence.

8   Q.      Had you gotten the magazine out at that time?

9   A.      No, I left it.

10  Q.      You left it in there when you were talking to him?

11  A.      Yes.

12  Q.      And you actually said, I think there's a gun in the

13  house.  This is on page 22, lines 7 through 10.

14  A.      It's not -- but the live round, the magazine in top of

15  the dresser.  And y'all, I think, he said, already got the

16  other one out of the box spring.

17  Q.      Does that refresh your memory, was the magazine taken

18  out of the box springs?

19  A.      Let me read it again.

20              THE COURT:  Where are you reading from?

21              MR. IRVINE:  I'm at line 22 -- or, excuse me,

22  page 22, lines 7 through 10 -- or 7 through 14 is the

23  conversation.

24              THE WITNESS:  So that's -- Male Voice 2 is going

25  to be Mr. Richardson, so that's not me talking.  Up above I'm

 1    discussing where on other search warrants I found weapons

 2    hidden -- just for context I said, but I do have to look

 3    around to make sure, like the weapons used at Goodwill

 4    Village aren't here, because I'd hate for you to say, yeah,

 5    one is here and be playing me on the other side, but there's

 6    another one.  You know what I mean?

 7              So I was expressing if he told me where one was,

 8    I'd still have to search because there could be another gun

 9    that was used in the shooting or murder that I would also

10    need to search for.

11              And he said, it's not.  But the live round, the

12    magazine in the top of the dresser, and y'all -- I think he

13    said he already got the other one out of the box spring.

14              So that's him saying, I think he got the other

15    one out of the box spring.

16    BY MR. IRVINE:

17    Q.      Okay.  And you remember that it was still there.

18    A.      That we left it, yes, sir.  Generally, we leave things

19    in place, and then apply for a search warrant and it's just

20    still sitting there.

21    Q.      Well, what I want to hone in on, is Male Voice

22    Number 1, that's you saying, yeah, there was just a mag in

23    there.

24    A.      Yes.

25    Q.      And then Mr. Richardson tells you, you probably going

1    to have to look up in there.

2    A.      Yes.

3    Q.      So he's telling you to look further.

4    A.      Yes.

5    Q.      And you will find the gun.

6    A.      That's how I took it.

7    Q.      And would you agree with me that the gun was found

8    because of his statements made to you?

9    A.      I think it would have been found otherwise.  He told

10   us something we pretty much already knew that there was a

11   gun.

12           No, I wouldn't agree that it was found because of his

13   statement.  I think it would have been found anyway.

14   Q.      Well, that's --

15   A.      He did tell us where it was though.

16   Q.      That requires a little speculation; correct?

17   A.      I think it's speculation either way.  I think it would

18   have been found either way.

19   Q.      And it was a spot that you had already searched and

20   you hadn't found the magazine.

21   A.      I had not searched the box spring for evidence.  I'd

22   only lifted it to search for a person.

23           MR. IRVINE:  Okay.  Agent Cogswell, thank you for

24   your time.

25           THE WITNESS:  Thank you, sir.

1    THE COURT:  All right.  Redirect?

2    MS. CORNEJO:  Yes.

3                    REDIRECT EXAMINATION

4    BY MS. CORNEJO:

5    Q.    Agent Cogswell, can you explain to us that are not

6    involved in law enforcement, what is the difference between

7    searching for people and searching for evidence?  You made

8    that distinction during cross-examination.

9    A.    Yes, ma'am.  People are much larger, so if you're

10   searching for a fugitive, you can't look in a small drawer

11   because they're not going to be in there.  Like I said, I

12   will look in a washing machine, because people can fold up

13   very small when they wanted to avoid capture, attics, under

14   mattresses, under beds.  There's reasonable places that a

15   person can be.

16         I wouldn't find it reasonable if a hole is six-inches

17   wide and I can see a magazine in there to think that

18   Mr. Richardson crawled through that hole, because it's just

19   too small.

20   Q.    I want to discuss a bit the whole whether the box

21   spring was on the floor or not.

22         You stated that you have -- that is a place that

23   someone could hide, underneath; correct?

24   A.    Yes.  I believe Mr. Richardson's a little bit bigger

25   now, but I think he was around 135 pounds at the time.

*TESTIMONY OF AGENT CHASE COGSWELL*                          40

1   Q.      Okay.

2   A.      So he was pretty small.

3   Q.      All right.  Were there any blankets or pillows over

4    the bed?

5   A.      There were some blankets, yes.

6   Q.      I'm going to show you a different angle.

7           Agent Cogswell, I am --

8               MS. CORNEJO:  May I approach, Your Honor?

9               THE COURT:  Yes, ma'am.

10              MS. CORNEJO:  Thank you.

11  BY MS. CORNEJO:

12  Q.      Agent Cogswell, I'm showing you another photograph.

13   Can you please review that photograph and tell me if you

14   recognize what that is of.

15  A.      That's the magazine that was in bottom of the box

16   spring.

17  Q.      And did you take this photograph on November 12th of

18   2021?

19  A.      Yes.

20  Q.      And does it truly and accurately depict the way that

21   that room or that specific piece of evidence looked on that

22   date?

23  A.      Yes.

24              MS. CORNEJO:  Your Honor, I would seek leave to

25   enter this as an exhibit into evidence and publish.

1          THE COURT:  Yes, ma'am.

2          MS. CORNEJO:  Thank you.

3          THE COURT:  Exhibit Number 6 is a -- that is

4  Number 6; right?

5          CASE MANAGER:  Yes, Your Honor.

6          THE COURT:  Number 6 will be another photograph.

7              (Exhibit No. 6 admitted.)

8  BY MS. CORNEJO:

9  Q.     Agent Cogswell, can you please circle the evidence

10  that you saw.

11  A.     (Indicating.)

12  Q.     Okay.  And did you make -- do you see a tear in that

13  fabric?

14  A.     Yes.

15  Q.     Did you do that tear?

16  A.     No.

17  Q.     Is that exactly how you saw the evidence when you

18  lifted the box spring?

19  A.     Yes.

20  Q.     I want to discuss a little bit the beginning of the

21  conversation that you had with Mr. Richardson.  I would like

22  to play a little bit of Exhibit Number 1 just so that we can

23  kind of all see -- I want to see if that's how you remember

24  the conversation going.

25          THE COURT:  I believe the audio is Number 3.

1          MS. CORNEJO:  Three.  Thank you, Your Honor.

2          THE COURT:  Yes, ma'am.

3   BY MS. CORNEJO:

4   Q.     So I am beginning just right from the beginning.  I

5   just want you to listen to a little bit and let me know if

6   this is --

7                    (Audio played.)

8          MS. CORNEJO:  For the record I stopped at marker

9   1 minute and 12 seconds.

10  BY MS. CORNEJO:

11  Q.     So is that the beginning of the conversation you had

12  with Mr. Richardson?

13  A.     Yes.

14  Q.     Mr. Irvine brought up a situation where someone else

15  made a comment to Mr. Richardson about the kids being outside

16  with Malia and it being cold.  Do you remember that?

17  A.     Yeah.  I don't remember if he said anything about her

18  being cold, but they just said that she wouldn't be able to

19  get back in the apartment and be comfortable, I think.

20  Q.     And did you get items for the children?

21  A.     Yes.

22  Q.     And what specifically did you get?

23  A.     I don't remember.  Usually whatever they ask for,

24  usually it's like diapers and a blanket and whatever they

25  need.

 1          MS. CORNEJO:  Okay.  I have nothing further.

 2  Thank you.

 3          THE COURT:  All right.  Special Agent Cogswell,

 4  let me ask just a couple of quick questions.

 5          THE WITNESS:  Yes, sir.

 6          THE COURT:  Did you lift -- at one point it

 7  sounded like maybe you lifted the mattress and were looking

 8  between the mattress and the box spring, but now it seems

 9  like you lifted the entire box spring.

10          THE WITNESS:  It was both, sir.  I always look

11  between the mattress and the box spring, and under the box

12  spring, yes.

13          THE COURT:  All right.  And there were questions

14  about whether there was a bed frame under the box spring,

15  between it and the floor.

16          THE WITNESS:  Yes, sir.

17          THE COURT:  Would that have made any difference

18  to you?  Would you still have lifted the box spring?

19          THE WITNESS:  No, sir, I would have still lifted

20  it.

21          THE COURT:  All right.  I think that's all I

22  have.  All right.  Thank you.

23          THE WITNESS:  Thank you, Your Honor.

24          (Witness left stand.)

25

1

2              THE COURT:  I think those may be --

3              MR. IRVINE:  They were Ms. Cornejo's.

4              THE COURT:  Okay.  The transcript is over there.

5              Ms. Cornejo, any other proof?

6              MS. CORNEJO:  No, Your Honor.  We have submitted

7    our witness, Agent Cogswell, and all our evidence.  At this

8    point the Government rests.

9                      (Government rests.)

10             MR. IRVINE:  No proof, Your Honor.

11             THE COURT:  All right.  Well, that's a lot

12   shorter than I expected.  Do you want to be heard on

13   argument?

14             MR. IRVINE:  Just briefly, Your Honor.  Like I

15   said at the outset, I think issue number one is pretty clear

16   cut.  He was going in to question Mr. Richardson --

17             THE COURT:  Is there a mic near you?

18             MR. IRVINE:  Do I need to speak louder?

19             THE COURT:  Yes, sir.

20             MR. IRVINE:  Mr. Richardson was in custody, and

21   he turned on his recorder to go in and talk to him and elicit

22   information from him.  And the law is pretty clear that

23   you've got to Mirandize him, and if you don't Mirandize him

24   the statements are suppressed.

25             Issue two is admittedly more difficult.  I think

1   it's a closer call for the Court to make, but I do think that

2   the burden is on the Government to prove that it was made

3   voluntarily.  And I would submit that they failed to meet

4   that burden.

5               One, we have got 43 minutes of recording --

6               THE COURT:  All right.  Can I ask you a quick

7   question?

8               MR. IRVINE:  Yes, Your Honor.

9               THE COURT:  Set aside consent for a minute.  What

10  about if they applied for a search warrant?

11              MR. IRVINE:  That doesn't cure it.  You can't

12  say, well, we could have gotten a search warrant anyway;

13  therefore, this stuff shouldn't be suppressed.

14              THE COURT:  Really?

15              MR. IRVINE:  That's my understanding of the law.

16              THE COURT:  Okay.

17              MR. IRVINE:  Because it encourages them to do it

18  correctly and get the search warrant.  The Court's not going

19  to look behind whether or not a search warrant would have

20  ultimately been granted.  The fact remains, they didn't get a

21  search warrant.

22              THE COURT:  All right.  Well, then, so what is

23  the standard for consent?  It's voluntary; right?

24              MR. IRVINE:  It's whether or not the consent was

25  voluntary.

1          THE COURT:  Okay.

2          MR. IRVINE:  And I cited in my brief, it's just

3    totality of the circumstances.  The Courts look to -- and I

4    think Ms. Cornejo cited this in her brief.  The Sixth

5    Circuit's identified a number of factors that are often

6    relevant to the question of whether consent was voluntary,

7    including characteristics and details of the interrogation;

8    including the youth; his lack of education; his low

9    intelligence; lack of any advice to the accused of his

10   Constitutional Rights; the length of the detention; the

11   repeated and prolonged nature of the questioning; and the use

12   of physical punishment, such as deprivation of food and

13   sleep.  And, obviously, we don't have things like that here.

14          THE COURT:  Sure.

15          MR. IRVINE:  But what we do have is we know that

16   at least for 43 minutes neither one of these people gave

17   consent, not Ms. Niles, not Mr. Richardson.

18          In fact, we've got an acknowledgment that she

19   specifically refused consent.  You have the defendant in

20   custody, and that weighs against the Government, although

21   it's not dispositive, but he is in custody.

22          You have conflicting statements.  On the one

23   hand, Mr. Cogswell says, we can apply for a search warrant.

24   The Judge doesn't have to sign it.  It's totally up to you.

25   No pressure.

1          But in almost the same breath, he comes behind

2    that and says, we found this ammunition, we are going to

3    search.  We have to search.  It doesn't matter.

4          So it's difficult to reconcile those statements.

5          THE COURT:  Well, but that was -- I mean, you

6    made a big point about the fact that they talked for

7    43 minutes.  That was at about minute number three.

8          MR. IRVINE:  It is.

9          THE COURT:  So, I mean, a lot was said between

10   then and the end of the conversation.  But keep going.

11         MR. IRVINE:  You've got the -- and, thankfully,

12   Agent Cogswell tried to cure it.  But you've got the other

13   marshal -- and I don't want to paraphrase this, I would like

14   to read it.

15         THE COURT:  Well, I read it.

16         MR. IRVINE:  Okay.

17         THE COURT:  I saw what he said.  Sure.

18         MR. IRVINE:  So I, respectfully, submit they

19   hadn't met their burden of proof that it was a

20   voluntarily-made statement.

21         And I also think it's important that that gun --

22   I know Agent Cogswell addressed it with his testimony.  But

23   he had searched that home.  He had only found a magazine.

24   The box spring on the ground.  There was a little bitty hole.

25   And he went back in there and found the gun because of the

```
 1     statements made by Mr. Richardson.  I mean, that's how this
 2     Glock was found.
 3                 THE COURT:  Well, okay.  I understand your
 4     position.
 5                 MR. IRVINE:  Thank you, Your Honor.
 6                 THE COURT:  Ms. Cornejo?
 7                 MS. CORNEJO:  First and foremost, Your Honor, I
 8     would like to address the first issue, which is, you know,
 9     the fact that the defendant was not Mirandized.
10                 Your Honor is very familiar with case law, and so
11     is counsel.  I would just like to reiterate specifically that
12     even in Miranda, the Miranda case, Your Honor, the Supreme
13     Court held that volunteered statements of any kind are not
14     barred by the Fifth Amendment.  And, specifically, that the
15     procedural safeguards outlined under Miranda, they are not
16     required where a person is just taken into custody.
17                 So what they're saying, specifically, is it
18     doesn't matter whether they're in custody, but what matters
19     is were they subject to interrogation.
20                 Now, obviously, counsel and I have different
21     views on whether this conversation that occurred was an
22     interrogation.  Correct?  And that is the whole fact-finding
23     issue that Your Honor needs to make a determination on.  We
24     submit that this was not an interrogation.  You know, it's
25     not like he was behind cell bars, and, you know, sitting
```

1    there with a light shining on him, and, you know, everyone --

2    they weren't at the police station, they were at his

3    residence, they were in his living room.  And those are --

4                THE COURT:  In your handcuffs.

5                MS. CORNEJO:  Well, Your Honor, safety is very

6    important to all people involved.

7                THE COURT:  Okay.

8                MS. CORNEJO:  But, yes, he was handcuffed and

9    we're not disputing that.  We're not disputing that at all.

10               Nonetheless, Your Honor, moving on.  I know

11   Your Honor -- in regards to the issue of voluntariness --

12   yes?

13               THE COURT:  Let me ask this question about

14   interrogation.  Whose perspective matters?  In other words,

15   is it the officer's perspective of whether they're

16   questioning or not, or is it the defendant's perspective of I

17   think he wants me to tell him some information.

18               MS. CORNEJO:  I think it's both, honestly.  I

19   think when you're looking at the consent issue, I think the

20   fact that --

21               THE COURT:  Well, I'm talking about issue one,

22   the statement, and whether it's interrogation or not.  Is

23   that based on the officer's intent when he goes to talk; or

24   is it the defendant's perspective of this officer's engaging

25   me in a conversation and so they start to tell things that

1   turn out to be incriminating?

2              MS. CORNEJO:  Yes, Your Honor.  I specifically

3   have not researched that issue.  But what I was trying to say

4   was that I do think, depending on -- obviously, this is all a

5   big -- this would be a great law school examination question;

6   right?  Because is there probable cause?  Is there Miranda?

7   You know, everything is kind of linked together.

8              And what I was trying to say was, the Miranda

9   warnings are important when looking at whether consent was

10  voluntary.  Right?  That's one of the factors I would think.

11  And we wouldn't even be here if he was Mirandized.  So the

12  Miranda warnings, in regards to whether this was an

13  interrogation, when analyzing consent, it is our position

14  that at that point it is Mr. Richardson's subjective point of

15  view.

16             But then later on, we're making arguments for

17  inevitable discovery in good faith.  And I think, Your Honor,

18  from that perspective, in those arguments, it would then be

19  Agent Cogswell's perspective.  Right?  Did he think it was an

20  interrogation?  Because then you're looking at, was

21  Agent Cogswell -- did he act like a reasonable police

22  officer?

23             So I just think it depends on what stage of the

24  analysis Your Honor is looking at.  But, again, I would have

25  to do case law research on that, and maybe I'll do that next

1    weekend when I'm sitting at home.

2            Clearly, Your Honor, the voluntary issue, I'm not

3    going to get into it.  You know the factors.  You have had an

4    opportunity to listen to the audio.  Agent Cogswell is very

5    polite, very respectful.  And he just tells him from the

6    beginning, like, listen, I'm going to apply for a search

7    warrant.  And that's kind of like what the whole conversation

8    is about.

9            I do want to point out, I believe it's page 23,

10   starting at line 15, this is Agent Cogswell:  You're welcome

11   to follow me around, but I've got to go -- but I've got to

12   get you to sign a piece of paper.  I'll get both of y'all to

13   sign it saying, yeah, it's okay.  I wasn't pressured into

14   this.  Because I'm not pressuring you and I'm --

15           And Male Voice Two is Mr. Richardson:  Nah, you

16   not.

17           I mean, he says there, you're not pressuring me.

18   So the consent issue goes away.  Moreover, counsel did not

19   attack Ms. Niles' apparent and actual authority.

20           I understand why this motion was filed, but at

21   the end of the day, I don't see how anyone can get over that.

22   Now, if she came in here and said, you know, they pointing

23   guns at me and cursing at me and threatening to call DCFS and

24   dadada, that would be completely different; right?  Even

25   though she's not a party, one could make the argument was her

1    will overboard.  But nothing in the recording, nothing in

2    Agent Cogswell's testimony, nothing in counsel's motion even

3    hints at that.

4              THE COURT:  So what if you throw out his consent

5    and you've got her consent, does that cover the area?

6              MS. CORNEJO:  Yes, Your Honor, absolutely it

7    does.  I can't think of a case off the top of my head, but

8    there's --

9              THE COURT:  Well, I've had cases where defendants

10   will argue that they refused and they were adamant about

11   refusing, but the other occupant of the residence gave

12   consent.  And the Government's argument is a reasonable

13   officer would have relied on the other occupant, not the

14   defendant at that point.  Things along those lines can

15   happen.

16             Mr. Irvine, I'll give you a chance to respond.

17   Don't worry.

18             MS. CORNEJO:  And, Your Honor, this was clearly a

19   case where if you look at the totality of the circumstances,

20   they were together.  They called themselves the Richardsons.

21   So I don't know, legally, if they were married at the time or

22   if they were engaged.  But when one starts putting themselves

23   out as a family, one can make the assumption.

24             And Agent Cogswell made the assumption, correctly

25   in the Government's position, that Ms. Niles had authority to

grant consent.  It's not like he asked the kids, hey, can I

look at your house?  That would be unreasonable.  And if

Agent Cogswell brought me that case, I would just say I'm not

indicting, because that would make no sense.  Right?

But live-in girlfriend, fiancee, you know, that's

par for the course.  Case law is very clear.  In doing the

research, I know there's cases where, you know, mom gives

consent through the house, even though it's a son's bedroom,

things of that nature.

THE COURT:  Sure.

MS. CORNEJO:  And Your Honor knows our position

in regards to the fact that the inevitable discovery doctrine

does require speculation.  Counsel is correct in that.  But

in this case, Agent Cogswell testified that he contacted the

U.S. Attorney's Office.  And he said, hey, do you think I

have probable cause to get a search warrant?  I saw loose

ammo on the ground.  This student's a convicted felon.  He's

been indicted for a 922(g)(1), can I get a search warrant?

And he was told, yeah, go ahead, start writing it.

So, I mean, it's not like he's just sitting up

here pontificating about, well, I think I had probable -- I

mean, he really made the steps that a reasonable police

officer, a reasonable law enforcement agent would make.

And as Your Honor pointed out, in the beginning

of the audio, what's the first thing that Agent Cogswell's

1    talking about?  He's like, all right, I'm going to get a

2    search warrant.  He's not -- he just tells him what he's

3    going to do and what the next steps are.  Which I hope if,

4    you know, if there were federal agents in my house they would

5    tell me what's going on.

6              And at the end of the day, Your Honor, the

7    actions of Agent Cogswell were reasonable, they were lawful,

8    they were constitutional, he treated everybody with respect.

9    And we would ask that you deny counsel's motion to suppress.

10             THE COURT:  Okay.  Mr. Irvine, you were about to

11   stand up and say something about the consent.

12             MR. IRVINE:  I was, Judge, and I'm on West Law

13   trying to make sure that I'm correct.  I don't want to

14   mislead the Court.  But I don't think that it's true that one

15   party's consent overrides another party's right to privacy.

16   I don't think that's the law.  I think the law is when the

17   Government knows two people have a right to privacy in the

18   same residence, that they both need to consent.

19             THE COURT:  I don't think you're right about

20   that.  But go ahead.

21             MR. IRVINE:  Well, that's what I was trying to

22   look up.

23             THE COURT:  Okay.

24             MR. IRVINE:  And, again, I'm not certain of that.

25   I sure thought that was the law.

1          THE COURT:  Well, I'm confident that's not the

2    law.  But it depends on a lot of things, are both of them

3    present?  You know, to what level has one of them said yes or

4    no, things like that.  There are all kinds of issues with it,

5    and considerations about it.  But you don't have to get

6    consent from both.

7          MR. IRVINE:  Okay.  I would --

8          THE COURT:  Generally speaking.  I don't want to

9    go too far, because I'm not ruling right now.  So go ahead.

10          MR. IRVINE:  Well, and I'll take a look at it.

11          I do want to address, though, issue number one,

12    because, again, that's pretty clear cut.  And I think -- I

13    don't know if the Court's had an opportunity to review the

14    U.S. v. Murphy case that they cited in their brief.

15          But in the Murphy case, they are chasing a guy

16    and they get him at his car and they open the car door and

17    he's making spontaneous utterances, and he's just -- he's

18    making incriminating statements as soon as they open the car

19    door to take him into custody.

20          Here, we have a federal agent turning on an audio

21    recorder to memorialize an exchange between a person in

22    custody and law enforcement.  That's quite a difference,

23    Your Honor.

24          THE COURT:  Right.  So I don't know if there's a

25    dispute about this; and if there is, we'll -- but the sense I

```
 1    have is that Agent Cogswell and the defendant had met before.

 2    When was that?  Is there a dispute about when that happened?

 3              MS. CORNEJO:  Would you like me to answer that

 4    question, or Agent Cogswell?

 5              MR. IRVINE:  I know they met.  I just don't know

 6    when they met.

 7              THE COURT:  How long before this search warrant?

 8              AGENT COGSWELL:  I'm not sure, Your Honor.  It

 9    had been several months.

10              THE COURT:  You were in his phone as ATF dude, so

11    I figured --

12              MS. CORNEJO:  ATF dude.

13              THE COURT:  -- they had met before.

14              MS. CORNEJO:  They had met, Your Honor.  And from

15    my recollection, I'll proffer to the Court, that not only did

16    they meet, but he also had spoken to Ms. Niles about

17    Mr. Richardson cooperating with the Government.  Because,

18    obviously, that's always a big conversation that the agents

19    have to have as far as safety and witness protection.  But,

20    yes, that's my recollection as well.

21              THE COURT:  Okay.  Because, I mean, they weren't

22    stranger to one another.

23              MS. CORNEJO:  No.

24              THE COURT:  Okay.  All right.

25              Well, interesting.  And one of the other things,
```

 1   and I'll just say this so that y'all -- I'm not ruling right

 2   now, but sometimes during conversations -- or there are cases

 3   out there, let's put it that way, where the Sixth Circuit

 4   will look at a conversation and they'll say, you know, up to

 5   this point it's not interrogation.  And then after a certain

 6   point in time, maybe something is said, you know, things

 7   start to get into interrogation.

 8              There are cases where it goes, you know, up to

 9   this point anything that's said from here to there, it's all

10   fine.  After this, not fine.  After this, it is fine.  I

11   mean, they go so far as to take a conversation and they'll

12   carve it up.

13              I'm not saying I'm going to do that for

14   43 minutes, but it's -- it is at least a possibility here.

15              But interesting issue, and we've been looking at

16   it, and we'll keep looking.  What I would suggest -- when is

17   our trial date in this case?

18              MR. IRVINE:  December 5th.

19              MS. CORNEJO:  It is December 5th.

20              THE COURT:  Okay.  So we've got a little time.

21   What I may do, I do have a trial starting next week.  So it

22   may be two weeks or so, but we'll contact counsel and have

23   y'all come back.  Most likely I'll rule from the bench, but I

24   may write something up.

25              MS. CORNEJO:  Actually, Your Honor, I do want to

1    clarify something.  The December 5th jury trial is for

2    Count 1, which does not involve this statement.  I believe in

3    January is when the other counts, which would include this

4    statement, would go to jury trial.  So Your Honor has a

5    little bit more time.

6              I would like the Court to know that -- I do

7    apologize, I didn't respond in time to this motion.  Because

8    the motion's under seal, anything that's entered Mr. Irvine

9    and I do not get.  We had no idea that the October 3rd

10   deadline had occurred.  So if anything is entered for this

11   motion --

12             THE COURT:  No, I understand.  And we're going to

13   alter the way we do business.  We're going to send counsel

14   copies of things we have entered under seal.

15             MS. CORNEJO:  But we had no idea.  We were not

16   trying to be disrespectful to the Court.

17             THE COURT:  Oh, I know that.

18             MS. CORNEJO:  We've been trying to work this out.

19   Believe me.

20             THE COURT:  I understand.

21             MS. CORNEJO:  Okay.

22             THE COURT:  One of the things that happens in our

23   electronic filing system is I think there's a box you can

24   check where it will only go to counsel, but it's not

25   generally available to the public.  And there are other ways

1    that it's not available for anyone other than the Court, and

2    I think that's what happened when we entered the order.  But

3    we'll try to straighten that out in the future.  Okay?

4                    MR. IRVINE:  Yes, sir.

5                    THE COURT:  All right.  Well, thanks, everybody.

6    We'll be in touch on a ruling.  And then do we need to do

7    anything else, any report dates or anything like that?

8                    MS. CORNEJO:  Should we do a report date?

9                    MR. IRVINE:  We could.

10                   MS. CORNEJO:  Yes, let's set a report date,

11   because I think it's good to have.

12                   MR. IRVINE:  Well, frankly, I still owe the

13   404(b) response.

14                   MS. CORNEJO:  Okay.

15                   MR. IRVINE:  And that could be a motion date.

16                   MS. CORNEJO:  Oh, that's true.

17                   THE COURT:  Yes, what's going on with the old res

18   gestae --

19                   MR. IRVINE:  Again, I did not get a copy of the

20   order and we didn't really talk about how much time she was

21   asking for so -- when she filed a joint motion for both of

22   us.  So I need to get on that.

23                   THE COURT:  Okay.  Well, how long do you need to

24   respond to that?

25                   MR. IRVINE:  Two weeks.  Is that okay?

1              THE COURT:  Okay with me.  Is that okay?

2              MS. CORNEJO:  Yes, Judge.  I think I know what

3    counsel's position is.

4              THE COURT:  I think I do, too.

5              MS. CORNEJO:  Yes.  I don't think there will be

6    much surprise.

7              THE COURT:  All right.  So your response will be

8    due October 31, and then we could have another report date

9    maybe mid-November?  I don't want to go too far in November.

10   How about the week of the 7th?  Do we have any time that

11   week?

12             CASE MANAGER:  Your Honor, Tuesday, November 8th,

13   at 9:30 a.m.

14             THE COURT:  All right.  And how much leeway do we

15   have?  Because we may need some time, because I may rule at

16   that point on this and we may end up talking about the

17   404(b).

18             CASE MANAGER:  Your Honor, I would suggest in the

19   afternoon, around 2:30 in the afternoon.

20             THE COURT:  How's 2:30 on November 7th?

21             CASE MANAGER:  November 8th, Your Honor.

22             THE COURT:  I'm sorry, November 8th.

23             MS. CORNEJO:  That works for the Government,

24   Your Honor.  Thank you.

25             MR. IRVINE:  Works for me.

1                THE COURT:  Election Day.

2                All right.  November 8th it is.  We'll come back

3     and we'll see where we are.  Okay.

4                MS. CORNEJO:  Thank you.

5                MR. IRVINE:  Thank you.

6                THE COURT:  Thank, y'all.

7                CASE MANAGER:  All rise.  This Honorable Court

8     stands adjourned.

9                     (Adjournment at 11:44 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T E

2

3

4        I, CATHERINE J. PHILLIPS, Fellow of the Academy of

5    Professional Reporters, Registered Merit Reporter, Certified

6    Manager of Reporting Services, do hereby certify that the

7    foregoing 61 pages are, to the best of my knowledge, skill,

8    and abilities, a true and accurate transcript from my

9    stenotype notes of the Motion to Suppress on the 17th day of

10   October, 2022, in the matter of:

11

12

13   UNITED STATES Of AMERICA

14   vs.

15   TEVIN RICHARDSON

16

17   Dated this 7th day of November, 2022.

18

19   S/ CATHERINE J. PHILLIPS, FAPR, RMR, CMRS
     Official Court Reporter
20   United States District Court
     Western District of Tennessee
21

22

23

24

25

UNREDACTED TRANSCRIPT